PARSONS *vs.* LYMAN.

*In the matter of the Estate of* SAMUEL PARSONS, *deceased.*

THE testator was domiciled in the State of Connecticut, at the time of his decease, the will was proved and letters testamentary were issued there, and subsequently probate was granted and letters were issued in the county of New-York,—*Held*, that the law of the *situs* of the assets regulates the grant of administration, and the liability and accounting of the executor or administrator.

An executor or administrator, by virtue of his appointment in one State or country, derives no authority over the goods of the deceased, in another country or State, unless he obtain new powers in the jurisdiction where such goods are situated.

A foreign executor having collected assets in this State, before letters testamentary issued, and having subsequently qualified, is bound to account as executor for such collections, to the court by which he was appointed ; the letters relating back, for that purpose, to the time of the testator's death.

Though the account of a foreign executor must be settled according to the *lex rei sitæ*, yet the distribution of the estate, and the interpretation of the will are

PARSONS *vs.* LYMAN.

regulated by the *lex domicilii.* Where the testator, who was domiciled at the time of his decease, in the State of Connecticut, left assets in the State of New-York, and the executor after collecting the estate in New-York, applied to the Surrogate by whom he had been appointed, for a final accounting,— *Held,* that the proceeding would not be postponed, after the legatees had appeared and claimed a final settlement, in order to enable the executor to procure an interpretation of the will at the place of domicil, by means of a suit instituted there subsequent to the application for a final accounting in New-York.

Upon a final accounting, it is the duty of the Surrogate to look into the will, interpret its language, and direct a distribution according to the tenor and effect of its provisions.

The decree of the Court, at the place of the *situs* of the assets, will protect the executor or administrator at the place of domicil.

In closing what is sometimes termed an ancillary administration, the rights of the creditors, legatees, and distributees, resident within the country where it was granted, are protected and enforced, and the residuum will not, generally, be transmitted to the representatives abroad, until the final account has been settled with a due regard to the claims of parties intervening for the retention and distribution of their own shares.

The testator, after providing an annuity for his wife, payable out of his estate, gave the residue to executors in trust " for the sole use and benefit" of his children in certain " *shares*," and directed maintenance out of their respective portions, and payment of the " shares," after majority, in biennial sums ; with a gift over to issue in case of death before " payment" of the shares, or in default of issue, to the survivors,—*Held,* that the legatees took on the testator's decease, an absolute vested interest in their respective portions as tenants in common ; that the provision in regard to payment, and the executory bequests over, related only to the *corpus* or principal of the estate, and not to the income ; and that the legatees were entitled absolutely to the profits and income of their shares from the time of the testator's death.

Vested estates can be divested only upon the happening of the precise contingency, and to the precise extent, for that purpose specified in the will. The primary gift of the testator's whole estate or interest remains in the beneficiaries in every event upon which it is not divested. A clear absolute gift will not be divested upon reasoning merely conjectural.

Implication in order to affect or vary vested rights, must be necessary, and not merely probable.

A prior devise will not be disturbed further than is absolutely necessary to give effect to the posterior qualifying dispositions.

The rules in regard to the vesting of testamentary bequests are not varied by reason of the intervention of a trust, unless it be, that there is a stronger implication in favor of vesting where there is a trust, than where there is not.

Where there is uncertainty as to the vesting of a legacy, a provision for maintenance and support helps the vesting.

If legacies of a residue be vested, income is due as a matter of right to the owners

of the shares.—Residuary dispositions are particularly favored, not only in regard to vesting, but also in respect to the title of the legatee to the profits or fruit of the fund accruing before the time of payment.

In the construction of a will, it is a general canon of interpretation, that the term *share* is limited to the original portion, unless particular expressions extend this meaning.

HIRAM KETCHUM, *for Executor.*

As to postponement.—In this case the testator was domiciled in Connecticut—there the will was proved: the whole personal estate was there inventoried, and bonds were given in the Probate Court of that State by the executors for the faithful execution of their trust. A part of the property belonging to the testator was in the county of New-York, and for the purpose of getting possession of this property, it was necessary to take out letters testamentary from the Surrogate of the county of New-York. This new administration in New-York is treated by the law as merely ancillary or auxiliatory to the original foreign administration, so far as regards the collection of the effects and proper distribution of them. (*Story, Conflict of Laws, p.* 867, § 513.) The creditors of the testator are all paid; the legatees under the will ask distribution and payment to them of the assets subject to the jurisdiction of the Surrogate. Whether the Court here ought to decree distribution, or remit the property to the Connecticut administration, is not a question of jurisdiction, but of discretion. (*Harvey* vs. *Richards*, 1 *Mason R.*, 381; *Dawes* vs. *Head*, 3 *Pick. R.*, 128; 2 *Kent's Comm.*, 7th ed., 536; *Stevens* vs. *Gaylord*, 11 *Mass. R.*, 156; 2 *Kent's Comm.*, 7th ed., 527–531; *Williams on Executors*, 1301–2; *Churchill* vs. *Prescott*, 3 *Bradford R.*, 233; *Williams on Executors*, 303, 3, 2 *B.; Story, sec.* 513; 2 *Kent* 7th ed. 530; *Dawes* vs. *Boylston*, 9 *Mass.*, 337, *sec.* 355; *Pratt* vs. *Northam*, 5 *Mason*, 95.)

I. Assuming this to be the law, how ought the Surrogate to exercise this discretion? The estate is all securely invested according to the directions of the testator. It has all been

inventoried in the Connecticut court, bonds have been given by the executors to the satisfaction of that court. The legatees have received payment of legacies from the executors under the Connecticut administration. Accounts of these payments have been rendered to the Connecticut court, and approved by that court, while the legatees were all residents of the State of Connecticut; and, since that time, one of the legatees is still a resident of that State. A demand is made for additional payments of legacies claimed to be due, but which claim is disputed. A question of the construction of the will arises, which must be decided according to the Connecticut law. What the Connecticut law is, can be better decided by the judiciary of that State than of any other. These considerations ought, it is thought, to settle the question in discussion.

The only reason for withholding these funds from the Connecticut administration is, that some of the claimants are resident here; and, it may be said, that they ought not to be sent to a foreign tribunal to seek a recovery of their claim, when a domestic tribunal has jurisdiction of the question, and has funds subject to its control. But they have submitted to a foreign tribunal, and they could, while residents of the same State of the foreign tribunal, have claimed what they now claim; they have received parts of their claim, and they raise the question here whether they are not entitled to an additional amount. It would subject the executors to great inconvenience, entirely unnecessary in this case, to withdraw this question from the court in Connecticut, where the final accounting of the executors must be made. The only object of the legatees in requiring the Surrogate to make distribution is to obtain here a judicial construction of the will, and yet it is well settled that such judicial construction must be governed by the law of the testator's domicil. ( *Vide* 4 *Kent*, 7*th ed.*, 572; *Williams on Executors*, 933.) "It is a settled rule, that in the construction of a will of personalty, made by a testator domiciled in a foreign country, the *lex domicilii* must prevail, unless there is sufficient on the face of the will to show a different intention." (*Story, Conflict of Laws, sec.*

479, *a*, 479, *m*, 490, 491; *Van Buskirk* vs. *Hartford Ins. Co.*, 14 *Conn. R.*, 583, 8 *Paige*, 446, 519.)

II. But if the Surrogate should feel himself called upon to distribute the assets under his control to the legatees, he will not do so until the construction of the will has been given by the court in that State, in the suit commenced there to obtain such construction. [See decision on this point in the Superior Court.] The Court of Connecticut has exercised the same comity in the case of Anson G. Phelps' will. (*Sherwood* vs. *Judd*, 3 *Bradford*, 419.)

III. The Surrogate has only jurisdiction of the assets remaining in the State of New-York, after letters testamentary were granted here.

Before the granting of such letters all the debts due from persons residing here had been collected by the executors and accounted for to the Probate Court in Connecticut. The debts consisted of promissory notes which the testator, either as payee or endorsee, held. These, his executors collected and converted into assets in Connecticut, long before letters testamentary were taken out here. (*Vroom* vs. *Van Horne*, 10 *Paige*, 549. See *p*. 557.)

As to the Construction of the Will.—The great question to be decided in this matter is, whether by the will of the testator, the shares left to the use of the children are to be separated into distinct funds, and the payments provided for in the will to be made out of them, or not. If, upon the death of the testator, the executors were required to partition off the property, two-fifths to the son and one-fifth to each of the daughters, to keep these shares separately invested, and in short to act as trustees of four different estates, then, perhaps, the argument of the children's counsel, that they acquired a vested interest immediately upon the death of the testator, would have some appearance of plausibility. Or, if the

shares were payable clearly out of the principal, without any disposition being made of the interest, then it may be contended, that in addition to the share of the principal, the interest would also be payable to them.

But is this so? Has the testator provided for any such partition of the estate, or has he left the interest unmentioned and unprovided for? I think not. It seems very evident, from the language of the will, that the executors were to hold the entire estate of the testator as a *general fund.* This fund was to be composed of all moneys which might come into the executor's hands, whether from the sale or profits of real estate, or from the interest of money. If this is so, then the children are to be treated as tenants in common of this general fund, the son representing two-fifths in value, and each of the daughters one-fifth. This fund is made subject to the charges in the will specified, viz.: the expenses of the estate, and the annuity of the widow; and then to the payments to the children, specified in the will, the executors to take care that no more than two-fifths in value shall go to the son, and no more than one-fifth in value to the daughters. This must follow, if the executors are to hold the property as a general fund.

My reasons for supposing that the testator intended the executors to hold the estate as a general fund, are:

1. No directions as to a division or partition of the estate into separate shares, and no directions as to separate investment of shares, so as to keep each with its rents and profits distinct from the other, are to be found in the will.

2. The executors are directed to pay, annually, to the widow, during her life and widowhood, the sum of seven hundred dollars, in each and every year, from the estate. No provision is made for investing a particular sum giving her the interest, but the whole estate is made chargeable with it.

3. The wood lots, in Guilford and Durham, are to be sold, and the proceeds of sale added to the general fund.

4. The houses in Eighth street, New-York, are to be sold,

as soon as they can be to advantage, and the proceeds of sale added to the general fund.

5. If not sold by May, 1857, when the ground leases expire, the executors are directed to renew the leases, and then to sell the houses, and add the proceeds of sale to the general fund. The will was made, and the testator died in October, 1848. This, therefore, contemplated the existence of a general fund nine years after the death of the testator.

It is then pretty plain, that the executors were to hold the estate as a general fund. Does that fund include interest? My reasons for supposing that it does, are:

1. The testator had it in view that the property should draw interest. He expressly provides, that the funds coming into the executors' hands, should be invested in good interest-paying stocks.

2. Having it plainly in his mind, the presumption of law is in favor of his having provided for its disposition in his will, and any language in the will which may reasonably embrace it, will be held to include it.

3. The will says, that the funds arising from all bills of exchange and promissory notes, as well as all other funds, which may come into the hands of the executors, are to be invested, &c., until such funds are wanted to fulfil the provisions of the will. The words, all other funds, may reasonably include interest; if so, and if no other intention is apparent, they do, by law, include interest, for it is shown, by the will, that the accumulation of interest was in the mind of the testator, and the disposition to be made of that interest is nowhere else provided for.

4. The grant to the executors of the estate to be held as a general fund, for an undefined period, with directions to invest it, so as to draw interest, would of itself give them a right of property in the interest; for the words, general fund, are indefinite, and would include all moneys in any way connected with the estate during such period.

If these points be correct, then the argument on the other side, that the children are entitled absolutely to the interest as soon as it accrues, falls to the ground, because their position, viz., that the interest is not provided for in the will, is baseless. It *is* provided for. It is to accumulate, to be invested, and re-invested, until it, with the remainder of the fund, is wanted to fulfil the provisions of the will.

But, the other side will say, if this be correct, there is a conflict in the will between the general and the particular intent of the testator, and you destroy the only means of reconciling those intents. The general intent was that the children were to have this estate in their life time, and by your construction three of them cannot, in the natural course of human life, receive their share. In answer to this we deny such to have been the controlling intent of the testator.

1. Because he has in the will provided to whom the residue shall go after their death.

2. Because he has left the estate with the executors as a general fund, with power to increase it by exchanging one kind of property for another, and by investing it in good interest-paying securities. Had it been his controlling intention that this, with all its probable increases, should have been paid to the children during their life time, he certainly would have expressed it in the will.

3. Because it was obviously his general and controlling intention in the will to limit his children to certain specified sums to be received from time to time during their life time, so as to ensure them a decent livelihood, and, at the same time, to protect his estate from being squandered. For that purpose, the executors are to pay the son not exceeding $10,000 in any one year, and less, if they shall deem it for his interest; they are to pay the daughters $2000, biennially, and to diminish such payments in the exercise of a fair and sound discretion, provided they use no unnecessary delay, &c. This seems to be the controlling idea of the testator in drawing the will, to leave his children amply sufficient for their support, and yet to give his executors in whom he had

confidence, the power to diminish these sums, in case they were improvidently or badly used. He has specified the sums which he considered sufficient, and any construction of the will by which they would receive more from the estate, would be in direct contravention of this, the strongest and most plainly expressed provision of the whole will. The trustees have this power; but they are to exercise it with a fair and sound discretion, and are to use no unnecessary delay in making ultimate payment of each as aforesaid. These expressions are used in order to protect the children from capricious or tyrannical treatment on the part of the trustees, but not certainly as an indication of a controlling intention, that all the property should be paid during the life time of the children. It is probable that the testator may have supposed that each child would receive his share in his life time, that his property was not so valuable as it has turned out to be, or that he did not imagine that the estate would increase to such an extent under prudent management as it appears to have done. But that that was the controlling intention in the will upon which all its provisions were meant to be grounded, is highly improbable, especially when it is so vaguely expressed in the instrument, and when another intention conflicting with it is plainly set out. If such were his intention, he would have specified the value of his property, have divided it into shares, directed each share to be separately invested in the name of the child to whom it belonged, and then apportioned the payments so that the whole should be received within a certain specified time, or he would have bequeathed a specific sum to be paid in specified instalments. He has here however left the property to be paid at certain periods, not exceeding a particular amount, the trustees to use their discretion about the sum to be paid. The trustees might, in the use of a sound discretion, extend the time of payment of the son's share beyond the ordinary period of human life. If they used that discretion fairly, would any one say that the portion of the will giving it to them was a nullity, because by that means the whole would not be received during the son's life-

time? And yet the daughters' case is the same, with the exception that the property has been so largely increased since the testator's death, that the whole cannot be received during an ordinary life time. Then, by the opposite argument, the daughters can, by law, receive more than the son, because the daughters' share happens to have increased so they cannot receive the whole in a life-time,—not by the increase of the property, but by the discretion of the trustees. Then, if the son's share had been so increased that he could not have received it under the provisions of the will in the ordinary duration of human life, the provision as to him would also have to be annulled, because it conflicted with the alleged general intent of the testator. This would be to argue that in any event the executors must break the will. If they go ahead, and by judicious investments largely increase the property, they break the will, because then the specific payments provided for would not exhaust the share of each child during a life time, and that vitiates the will. If, on the other hand, they do not make such investments, they violate the will equally, because they are instructed to make them. But this is absurd, and the law will not give to an instrument an absurd construction. The only way to reconcile the whole will and give full play to all its parts, is to consider the portions directing the manner in which the shares are to be paid as explanatory of the words specifying the trust. He gives the remainder of the estate to the executors in trust for the sole use and benefit of the children and their respective heirs and assignees forever, in ths manner following, or subject to the conditions hereinafter prescribed.

With such a rendering, the remaining provisions of the will are fully carried out—the general fund is preserved, the widow's annuity is paid out of the estate, the children's shares are credited to them as debts of the estate, increased each year by a ratable proportion of the profits and diminished by the payments made to them; the fund is kept invested, until wanted to carry out the provisions of the will, and as to the surplus remaining, the testator does not die intestate, for

it goes first to the heirs, and, if none be living, then to the brothers and sisters, in the manner pointed out in the will.

W. STANLEY,

D. D. FIELD, *for Legatees.*

Statement.—1. The testator was a New-York merchant, and died, domiciled in Connecticut. He accumulated his property here. He kept his only bank account here at the time of his death. Assets have been received in this State, by virtue of authority conferred by this State, and not by virtue of any foreign authority, to the amount of upwards of $110,000. They must be administered in this State, according to the laws of this State.

2. The parties in interest are the four children of the testator, the husband of one of the daughters, the executor, and executrix.

The son and three daughters, and the husband of the married daughter, reside in this State: the son is in business here. The eldest daughter, the second daughter and her husband pay taxes here. The youngest daughter, who will be twenty-one next month, has for several years lived with the eldest daughter here.

The executrix, the widow, who is the general guardian of the minor, is ready and desirous of being appointed by the court guardian *ad litem* for her here.

The legatees, distributees, and heirs are every one of them living within this State.

The executrix, who resides in Connecticut, appears here, and accounts, and insists that her co-executor shall interpose no delay to a final decision and distribution here.

3. The only person asking for the long delay is the executor. He asks against the united wishes of every party in interest, that no legacies shall be paid until the end of a litigation in the State of Connecticut, carried to their highest court, commenced by him against the remonstrances of his co-executor, and the legatees who live here. And his first

application is for a postponement of payment for the period of seven months.

4. He says expressly, that he will appeal the case, no matter how decided, to the highest court in that State, and years will, with the ordinary delays of a law suit, pass, before a final decision can there be obtained.

5. The suit in Connecticut was commenced long after the executor had brought all the parties before the Court here. None of the parties have been personally served in Connecticut. A service by publication has been made good, *in rem*, as to the assets properly to be accounted for there, of which there was, beside the specific legacy to the widow, but fifteen or twenty thousand dollars, but it is not good service as to the assets to be accounted for within this jurisdiction, at least not good out of the State of Connecticut. The estate is perfectly solvent. There are no foreign creditors. There are no foreign legatees. There are no foreign heirs. There are no foreign next of kin. It is not pretended that there is any peculiarity in the laws of Connecticut that can affect the question of construction.

6. The facts about the will of Anson G. Phelps, relied on by the counsel for the executor, were entirely different from the facts of this case. The suit had been commenced here long before the suit was commenced in Connecticut. There were a great many parties in that suit, some thirty or more, and nearly all resided here, and desired the postponement. The executors lived here, the legatees lived here, the heirs and the next of kin lived here. The great bulk of the testator's property was here.

I. The motion for the long postponement was made too late.

II. The Court cannot decline exercising jurisdiction at some time. It has jurisdiction *in personam* and *in rem*, to the extent of more than $110,000.

The delay of seven months in making payments to four parties, of large amounts each, who were entitled to them

eight years ago, is an unreasonable postponement, and is a comity and courtesy to no one except to the executor.

No bonds were required by the will, and for this money, which the parties claim was intended to be paid to them, and which they claim is unjustly withheld by the executor, they have no security whatever.

There would be just as much reason in the proposition that a suit in this State upon a contract made in Connecticut, and governed by their laws, should be postponed for the decision of their Court upon its construction in a suit afterwards commenced in that State, as for the postponement of the present case.

III. The fact that the Connecticut administration is called the principal administration, and the one here auxiliary or ancillary, does not alter the rights of the parties. (*Harvey* vs. *Richards*, 1 *Mason R.*, 381; *Gravillon* vs. *Richards' Ex'r.*, 13 *Louis. R.*, 293.)

IV. The fact that it may be difficult and inconvenient, cannot authorize a court to decline jurisdiction and send the parties abroad. This point is also discussed in the case of *Harvey* against *Richards*.

But there is no difficulty in the case before the Court. There has been no final accounting in Connecticut. Any amount inventoried there can be credited to the account here, and by a simple entry conclusively settled.

V. Upon the comity of States.

Where an estate is solvent, it would be an idle show of courtesy to order the proceeds to be sent to a foreign country, and oblige our citizens to send there for their legacies, when no possible prejudice could arise to the estate, or those interested in it, by causing them to be paid here.

If the estate was insolvent, it might not be right to sequester the whole for its own citizens. (*Dawes* vs. *Head*, 3 *Pickering R.*, 128, *Chief Justice Parker.*)

Where there are no debts here, and none to claim as legatees or next of kin, the assets should be remitted to the foreign executor or administrator where the deceased was domiciled; but an exception to this general rule grows out of the duty of every government and its courts to protect its own citizens in the enjoyment of their property, so far as it may be done, without violating the equal rights of creditors living in a foreign country.

It by no means follows, that because national comity requires the distribution of property according to the law of the domicil, that it requires that the distribution should be made by the courts in the same place.

In *Harvey* vs. *Richards*, the suggestion is fully discussed and it was held, that it is no breach of comity, but a duty the courts owe to the citizens of the State to distribute funds in i⁺˙ jurisdiction, unless it can be proved that some one is to ꞏꞏfer by so doing.

VI. Upon the question of the comity of Courts.

It is settled, that the pending of a suit in one State is not a bar to a suit in another State, between the same parties, for the same cause of action. (*Bowne* vs. *Joy*, 9 *J. R.*, 221.) And it is settled, that the judgment of a court of competent jurisdiction upon the same point, is conclusive between the same parties, upon the same matter coming directly in question in another suit. (*Gardener* vs. *Buckbee*, 3 *Cowen*, 120.)

No case can be cited—no authority shown for an exercise of this comity of courts in a case parallel to the present.

There is no pretence, coming from the distinguished Connecticut counsel, nor from the distinguished New-York counsel, that there is any point relating to the will in question in which the Connecticut law differs in the slightest degree from the New-York law.

The only person demanding the delay, is the executor; and the only reason that he pretends to give for it is, that he wishes to protect himself from liability.

His counsel, on the argument, and in his points, has aban-

doned the proposition at first strenuously insisted upon, to wit : that the Surrogate could not make a binding decree.

He has abandoned the ground of jurisdiction, right, and power, and based his argument on the comity of courts.

Who asks for this comity ? Mr. Lyman does not wish to take the legatees to Connecticut, if he can be protected here. It is a palpable and a perfect answer to him, therefore, that he can be protected here.

Does any Connecticut judge or court desire this postponement ? In point of fact, no Connecticut court or judge has ever yet heard of this suit. The writ is not returnable until the middle of April. If their citizen, Mr. Lyman, is protected, and if that is all that he asks, or can reasonably ask; if Mrs. Parsons, the widow and executrix, their citizen, desires an immediate final judgment; if the legatees and heirs wish their legacies, can any Connecticut judge or court reasonably object ? Would the Surrogate, on a suit he never heard of, feel aggrieved, if Connecticut legatees should be paid by a Connecticut court, although the testator was domiciled and the will proved here ?

Why not protect, by a speedy decision, the legatees, as well as the executor ?

It is not enough to warrant the exercise of this unusual courtesy, that the case is a difficult one. There should be some peculiarity of Connecticut law, some doctrine or principle with which New-York courts are unfamiliar—of this there is not the slightest suggestion.

As to the construction of the will : Statement.—The testator, domiciled in Connecticut, died there in 1848, leaving one son and three daughters, all under age, and his widow.

He gave by his will to his wife his house, grounds, furniture, &c., and an annuity of $700 a year.

He left free of debt an estate of $130,000, besides the above bequests, and after allowing $11,000 for the annuity. It was nearly all personal property. The whole estate was about $150,000.

With the exception of the above bequests, the estate was given to the executors in trust.

The only question that arises is as to what the children of the testator are entitled to under the will. They claim, that after provision shall have been made for the annuity, the estate should be divided into shares, two fifths for the son, and one fifth for each daughter.

On such construction, each daughter's share was, at the time of the testator's death, above $26,000. The simple interest upon it, biennially, was, at 7 per cent., some $3600. Some of their shares amount now to $35,000.

The biennial interest upon this is now $4900. The executor declines to pay, without the direction of the Court, any more than about one half of this interest, to wit: $2000 biennially, and claims that they cannot, under the will, receive a dollar of the principal of their shares.

Eight years have elapsed since the death of the testator.

The executor has taken for his services, besides all disbursements, $3000 biennially, which is one half as much as all the daughters have received. They have received but $2000 each, biennially, since they became of age, and no part of the principal of their shares.

Upon the death of any child, whatever portion of that child's share may then remain in the hands of the executors, is to go to that child's issue. If there be no issue, to the survivors of the testator's children.

The will contains no residuary clause.

The children claim that they take vested interests in their respective shares.

That the clause as to the biennial payments to the son is valid:

That the clause as to the biennial payments to the daughters is repugnant to the general intent of the testator, and is void, because they can under it receive no part of their shares, not even the interest:

That if it is not repugnant, then that they are to have all the income from their shares, and the biennial payments from the principal.

I. In all cases the intention of the testator is to govern, if it be not inconsistent with the policy of the law. (*Holmes* vs. *Williams*, 1 *Root*, 332; *Finlay* vs. *King's Lessee*, 3 *Peters*, 346; *Jarman on Wills*, vol. 1, *p.* 809; *Parks* vs. *Parks*, 9 *Paige*, 106; *Pond* vs. *Bergh*, 10 *Paige*, 152.) The general intention of a testator overrules his particular intention, if they be inconsistent. (2 *Wms. Ex'rs.*, 2d *Am. ed.*, 789, 790; *Jesson* vs. *Wright*, 2 *Bligh*, 56; *Doe* vs. *Harvey*, 4 *Barn. & Cress.*, 620; *Chase* vs. *Lockerman*, 11 *Gill & John.*, 185; *Morton* vs. *Barrett*, 22 *Maine*, 257; *Cook* vs. *Holmes*, 11 *Mass.*, 528; *Thellusson* vs. *Woodford*, 4 *Vesey*, *Ch.*, 329.)

It is a well settled rule of law, that if the court can see a general intention inconsistent with the rules of law, and the the testator has attempted to carry that into effect in a way that is not permitted, the court is to give effect to the general intention, though the particular mode should fail. (*Master of the Rolls, in Thellusson* vs. *Woodford*, 4 *Vesey*, *Ch.*, 329, 2 *Bro. C. C.*, 51.) The doctrine is now fully established that the general intent, although first expressed, shall overrule the particular. The rule that the latter part of a will is to be taken as evidence of the intention of the testator, is only applied where the two provisions are totally inconsistent with each other; and then the general intent overrules the particular. (*Covenhoven* vs. *Shuler*, 2 *Paige*, 122; *Horner* vs. *Shelton*, 2 *Metcalf*, 202.)

II. The general intent of the testator, clearly expressed in the will was, that, except the specific bequest and the annuity, the estate should be paid to his children within a reasonable time, provided they should live.

They were the objects of his bounty. He declared it to be for the sole use of them, their heirs, and assigns, forever. He divides it into shares which he calls *theirs*. He directs that sums expended during their minority be charged to their respective shares; directs his trustees to make payments until their shares shall have been fully paid off and dis-

charged, and directs that they use no unnecessary delay in making ultimate payment to the daughters of their shares.

If a child should die before receiving payment of his or her share, without issue, then his or her share, which may remain in the hands of the trustees, to go over to survivors. If issue living, then such issue entitled to the share or shares of the respective parent or parents remaining in the hands of the trustees.

He speaks in the will of the son's share, as *his* share, five times.

He speaks of the daughters' shares as *their* shares, in six different places.

It is perfectly clear, upon the face of the will, that the testator's children were the repositories of his affection and bounty. The limitations over he deemed but contingencies to be provided for in case of their death.

III. The testator clearly intended that the son should receive his two fifths absolutely, as the payment to him, aside from the interest, would exhaust his share. He has used the same general language in relation to the shares of his daughters. If he had intended that his son should receive his share, and that his daughters should be disinherited, except as to an annuity of $1000 per annum, that idea would have been distinctly expressed.

But he more clearly and strongly expressed his desire that his daughters should receive their shares, than he did that his son should receive his, as he directs that there shall be no unnecessary delay in the payment of the daughters' shares.

He has no such clause in relation to his son.

IV. The clause directing the biennial payments, is not a restrictive clause.

It does not limit the clause expressing his estate to be for the sole use and benefit of his children. It does not cut them off from their interest by that clause given to them.

The will contains no restriction whatever upon the discre-

tion of the executors as to the amount they may pay to the daughters. There is a restriction as to the son. They cannot pay him more than $10,000 in any one year.

There are no express words prohibiting the executors from immediately paying the daughters their entire shares.

V. The investment clause does not require the investment of the interest in stocks.

The testator was speaking of the property which he might have at the time of his death. Besides, if it was to be invested, it was only for the purposes of the will, and to be transferred to the children according to the legal construction of the will.

VI. The testator did not intend to leave any of his estate undisposed of.

He intended that the entire residue of his estate, after payment of the specific bequests, should be for the benefit of his children, who were his sole heirs at law.

He expressly declared such intention, and nowhere restricted it. Where a residue of an estate is given, every presumption is to be made that the deceased did not intend to die intestate. (*Chamberlaine* vs. *Phillips*, 4 *Vesey, Ch.*, 51.)

A judge must divest himself of common sense, to impute such an absurdity to a testator as to suppose that he gives an interest to children for their respective lives only, and that if any one shall die under the age of twenty-one, then, that share given for life only shall survive to the others; and so, if more than one die under that age; but if any of them should live to attain twenty-one, in that case it should not go over to the survivors, but be undisposed of. (*Master of the Rolls, in Chamberlaine* vs. *Phillips*, 4 *Vesey, Ch.*, 51.)

This is a bequest to trustees of a residue, and in these cases the court struggles against an intestacy. This construction holds wherever it can be contended that payment merely is postponed. (*Master of the Rolls, Booth* vs. *Booth*, 4 *Vesey,* 402.)

General and doubtful words in a will shall not alter an express devise before, nor carry anything contrary to the apparent intent.

VII. The use of property is the interest or income of it.

In *Ex parte Ray*, (1 *Maddocks, Ch. R.*, 199,) the words *sole use* received a construction. It was a settlement of her property by a lady to trustees, "for her own sole use, benefit, and disposition,"—*Held*, that it gave her a separate estate. (See *Adamson* vs. *Armitage, Geo. Coop. Ch. C.*, 283, *and* 19 *Vesey*, 418; *Wills* vs. *Sayers*, 4 *Madd.*, 409; *Covenhoven* vs. *Shuler*, 2 *Paige, Chan.*, 123; *Glover* vs. *Spendlove*, 4 *Bro. C. C.*, 337, *Lord Eldon*.)

If the court should consider that the special directions as to the application of the trust property, do not exhaust it, it should be held to result under the will to the use of the children.

VIII. At the death of the testator, the legal estate of all the residue of the estate of the testator, except that specifically bequeathed, vested in the trustees; and they admit that they take no beneficial interest therein. The equitable estate of all the residue, &c., except as above stated, vested in the children of the testator as *cestui que trusts*, two fifths in the son, and one fifth in each of the three daughters.

They took an immediate vested interest, subject, perhaps, to be defeated, as to the portion that may remain in the hands of the executors upon their death. Their interest was immediate; payment only was postponed. (*Fonereau* vs. *Fonereau*, 3 *At. R.*, 645; *Stapleton* vs. *Chele, Pre. Ch.*, 317; *Jarman on Wills, vol.* 1, *p.* 641; 3 *Myl. & K.*, 289; *Adamson* vs. *Armitage*, 19 *Vesey*, 418; *Boraston's Case*, 3 *Rep.* 19, note *K.*; *Doe dem. Cadogan* vs. *Ewart*, 7 *Adol. & E.*, 636; *Edwards* vs. *Hammond*, 1 *Bos. & Pul., New Rep.*, 324, *note a*; *Bromfield* vs. *Crowder*, 1 *Bos. & Pul., New Rep.*, 313; 8 *Durn. & East, T. R.*, 112; 1 *Swift's Digest*, 156; *Preston on Legacies*, 68, 75, 80, 90; *Sweet* vs. *Chase*, 2 *Coms.* 73;

*Paterson* vs. *Ellis*, 11 *Wend.*, 260, and a great number of cases there cited.)

When time is annexed to the substance of the gift, a legacy does not vest; where to the payment only, it does. (*Stapleton* vs. *Chele*, *Pre. Ch.*, 317; *Fonereau* vs. *Fonereau*, 3 *Atk.*, 645.)

A leading distinction in regard to the vesting of legacies, is, that if futurity is annexed to the substance of the gift, the vesting is suspended; but, if it appears to relate to the time of payment only, it vests *instanter*. (1 *Jarman on Wills*, *p.* 641.)

Sometimes words that seemingly create a future interest, refer merely to the futurity of possession, and do not postpone the vesting of the estate.

. A leading authority is *Boraston's Case*, 3 *Rep.*, 19, *note K.*

In a devise of real estate, words of limitation are required, to give more than an estate for life. And words of qualification are necessary to restrain the extent and duration of the interest in personal property. (*Adamson* vs. *Armitage*, 19 *Vesey*, 418; *Doe dem. Cadogan* vs. *Ewart*, 7 *Adol. & E.*, 636; 8 *Durn. & East, T. R.*, 112, 596, 330.)

It is a general rule that when the whole property is devised, with a particular interest given out of it, this operates by way of exception out of the absolute property, and not as a precedent contingency. (1 *Swift's Digest*, 156, 1 *Burr.*, 228.)

IX. The beneficiary interests of the children of the testator being vested interests, they are entitled to the interest, rents and profits of their shares which accrued during their minority. (*Montgomerie* vs. *Woodley*, 5 *Vesey, Ch. Rep.*, 521; *Glanvill* vs. *Glanvill*, 2 *Merivale's Ch. Rep.*, 38; *Nicholls* vs. *Osborn*, 2 *P. Williams' R.*, 419; *Taylor* vs. *Johnson*, 2 *P. Williams' R.*, 504; *Genery* vs. *Fitzgerald, Jacob's Chan. R.*, 468; *Trevanion* vs. *Vivian*, 2 *Ves., Sen.*, 430; 1 *Jarman on Wills, p* 487.)

X. It is a well established principle, that if any word or

expression be repugnant to the clear intention of the testator as manifested in other parts of the will, it may be rejected as surplusage, and shall not defeat a legacy or bequest. (*Sargent* vs. *Towne*, 10 *Mass.*, 303; *Cook et al.* agt. *Holmes, &c.*, 11 *Mass.*, 528; *Bartlett et al.* agt. *King, Ex'r.*, 12 *Mass.*, 537; *Nourse* vs. *Merriam*, 8 *Cush. R.*, 12; *Bradstreet* vs. *Clarke*, 12 *Wend.*, 665; *Norris* vs. *Beyea*, 3 *Kern.* 273.)

The clause in the will, directing the biennial payments to the daughters, of $2,000, is repugnant to the other provisions in the will and to the general intent of the testator, and is therefore void.

It being conceded that the daughters have a vested interest in their respective shares, (that is an immediate right of present enjoyment, or a present fixed right of future enjoyment,) the only question is, when shall their shares be paid to them? By this clause, never! It is repugnant, therefore. It was repugnant at the outset. The will was signed but fourteen days before the testator's death, and their shares then were some $26,000. The will directed it to be put forthwith in stocks, the interest on which was then, at least, one-half more than such biennial payments. When they became twenty-one, the shares of Caroline and Elizabeth were $35,000 each. The biennial interest, at seven per cent., is now $4,900, and by adding the interest, annually, over $5,000 biennially. If they live ten years more, it will be double that sum. If the testator intended that their shares should be paid to them in this mode, it being impossible that they should receive one farthing of it, the particular mode is void, and should be stricken from the will.

XI. If the court should hold, that the biennial payment clause was not repugnant, it could be but on one theory, to wit : that the testator intended to give his children the whole interest, and these biennial payments from the principal beside. No other construction can save it from utter repugnancy.

He probably neglected to make the computation, and

supposed that their shares would be exhausted in the same manner as the son's.   There is no manner of doubt that he intended that at some time his daughters' shares should be paid off and discharged.

It is improbable that he had a distinct definite intention in the mode of payment, that all the interest should be paid, and the $2,000 biennially beside.   If he had that intention, he would have expressed it.

Even if the court should hold, that he had the two intentions :

1st.   That the whole interest be paid ; and,

2d.   That the $2,000 from the principal should be paid ; those intentions would even then be repugnant, as the entire principal could not then be paid over until the daughters were fifty, which would be an *unreasonable postponement* of the time of payment of their shares, and the court would strike out the clause, and direct them to be paid.

It might be, perhaps, successfully insisted that the limitations of the shares of the testator's children over, are void ; because the language used is such, as in relation to real estate, would create an estate tail ; and it is an established rule, that the same expressions which in a freehold create an estate tail, in chattels create an absolute interest. (*Seal* vs. *Seal*, 1 *P. Wms.*, 290 ; *Brouncker* vs. *Bagot*, 1 *Meriv.*, 271 ; 2 *Fearne, on Cont. Rem.*, 161, 167 ; *Paterson* vs. *Ellis*, 11 *Wend.*, 260 ; *Norris* vs. *Beyea*, 3 *Kern.* 273.)

But, if the last proposition is not admitted, it would not affect the position, that the clause, directing the biennial payments is repugnant to the general intention of the testator.

The interests of the children in the shares each of the other, are not vested interests, as the estate in remainder is limited to take effect upon a dubious and uncertain event, to wit : the death of one of their number without issue. Those interests (if not wholly void) are contingent. (2 *Black. Com.*, 168–9 ; 4 *Kent's Com.*, 194 ; *Hudson* vs. *Wadsworth*, 8 *Conn. R.*, 348 ; *Holms* vs. *Williams & Crary*, 1 *Root*, 332 ; *Morgan* vs. *Morgan*, 5 *Day*, 517.)

And it is important to note, that the subject matter of such contingent interests is not the whole share of any one of the children, but only of so much as may, upon the happening of the contingency, remain in the hands of the trustees. There is nothing, whatever, in these contingent interests restricting the payment of the respective shares. They do not reach anything that has been paid, and do not conflict with payment. This was not the primary and leading thought of the testator, but a subordinate and contingent provision.

XII. Giving the interest of an estate, vests the principal. (*Bunn* vs. *Winthorp*, 1 *Johns. Ch.*, 329; *Newland* vs. *Shephard*, 2 *P. Williams' R.*, 194; *Phillips* vs. *Chamberlaine*, 4 *Vesey*, *Ch.*, 58.) Much more then does giving a vested principal vest the interest. (*Bunn* vs. *Winthorp*, 1 *Johns. Ch.*, 329; *Newland* vs. *Shephard*, 2 *P. Williams*, 194.)

A residuary devise of the dividends and interest of personal property carries the principal. (4 *Vesey, Ch.*, 58.)

XIII. If the court should hold that the children did not take vested interests in their shares, and consequently were not entitled to the interest thereon, then the court must hold that the interest of their respective shares is undevised, and the children would take it as the heirs at law.

XIV. The will gives the executors the discretion to pay the son $10,000 a year, after twenty-five.

XV. Upon the construction contended for by the executor, the will is inconsistent and unreasonable and absurd.

The idea of an annuity of $1,000, is inconsistent: 1st. With the expression "for their sole use and benefit." 2d. With the idea of their "shares." 3d. With the idea of their "shares" being paid to them. The construction is absurd that they should have the share of another, and not a dollar of their own share. It is unreasonable, that unborn issue should have principal and interest, and the children of the testator, for

whose sole use and benefit he has declared he has bequeathed it, should be disinherited. It is unreasonable, that an executor, a stranger, should take more than one-half as much as three of the testator's children.

The decree should be, that the annuity be paid off; that the devisees take vested interests in their respective shares, and contingent interests in remainder, each in the other's share; that the provision for the biennial payments to the son is valid, but that the executors have the discretion to pay him $10,000 per annum; that the provision for the biennial payments to the daughters is repugnant and void. But, if the court should hold that the last mentioned provision is not repugnant, then the order should be, that all interest on their respective shares, since the death of the testator, be paid over, and that the biennial payments be made from the principal, and that the executors should pay over, forthwith, to the devisees, the entire principal and interest of their respective shares now due.

THE SURROGATE.—The testator was formerly a merchant in this city, and having retired from active business, he removed to the state of Connecticut, where he was domiciled at the time of his death. His will was proved in that jurisdiction, and its execution assumed by the executor and executrix, October 27, 1848. Probate of the will was granted by the Surrogate of New-York, November 6, 1848, but letters testamentary were not taken out here until March 15, 1855, when Mr. Lyman, the executor, gave a bond, and became qualified to act. On the third day of December, 1856, the executor filed his petition for a final settlement of the accounts of the estate before the Surrogate of New-York, and cited in all the parties interested to attend the adjustment. On the return of the citation, January 15, 1857, the accounts were filed; the legatees who were of age appeared by counsel, and the case was adjourned to January 29, and again to February 10, on which latter day the legatees presented a petition for a compulsory accounting and for distribution.

The cause was set down for March 10, when the counsel for the executor moved for a postponement, on the ground that there was doubt as to the correct interpretation of the will, and his client had instituted a suit to establish its construction before the Superior Court, within and for the county of Middlesex, in the state of Connecticut, sitting as a Court of Chancery. The proceeding, for the determination of which I am asked to stay the settlement of the accounts, was commenced on the 16th day of February, 1857, and the process made returnable on the second Tuesday of April succeeding.

It is obvious, therefore, that after presenting his application, voluntarily, to this court, for the adjustment of his accounts, after all the parties had been cited, and the adult legatees had come in, assented to the proceeding, and deliberately by petition claimed a settlement, the executor has instituted a suit in another court, in another State, the results of which he now asks this tribunal to await. The question arises under this state of facts, as to the power and authority of the courts of New-York in regard to this controversy, and what is due from them on the ground of comity, to the courts of another State, where the testator had his domicil at the time of his decease.

Whatever doubts may have existed relative to the power of a foreign executor, when acting out of the jurisdiction whence he received his authority, the question is now definitely settled. There has been loose practice on this point, and vague opinions have even appeared in the books, looking towards some right in the executor independent of the grant of administration, but they have not been based upon principle or sound reasoning. The rule and the reason of it are nowhere more clearly enunciated than in the case of *Holcomb* vs. *Phelps*, (16 *Conn. R.*, 135), decided by the Supreme Court of Errors of the State of Connecticut. That tribunal there said, " It is now, therefore, well understood that an executor or administrator, by virtue of his appointment in one State or country, derives no authority to seize the goods of the deceased, or to bring actions for his debts in another

country or State, unless he obtain new powers and give new security in the State or country where such goods are or such debtors reside."

The truth is, that an executor or administrator is treated as an officer, and he has, generally speaking, no power by law, until he is clothed with official authority. He represents the decedent by virtue of a grant made to him by the State, and without his commission he has no legal *status*. The theory of the common law is that, on the death of a person, his goods become *bona vacantia*, and their charge devolves upon the crown. Administration is a matter of prerogative, consequent upon the *situs* of the assets within the jurisdiction of the sovereign authority, and the title of the last owner being extinct by death, the State, as trustee, deputes its right for the benefit of parties whom the law recognizes as having an interest in the estate. Were there any other rule than this, it would be strange and anomalous; for the laws of a country have no extra-territorial operation, and do not, in the very nature of the case, possess any vigor within the limits of another sovereign power.

By the Revised Statutes of New-York, the general functions of an executor or administrator cannot be performed before the grant of letters. The law is express in all cases, that "no executor named in a will shall, before letters testamentary are granted, have any power to dispose of any part of the estate of the testator, except to pay funeral charges, nor to interfere with such estate, in any manner, further than is necessary for its preservation;" and "every person named in a will as executor, and not named as such in the letters testamentary, or in letters of administration with the will annexed, shall be deemed to be superseded thereby, and shall have no power or authority whatever, as such executor, until he shall appear and qualify;" (2 *R. S.,p.* 71, §§ 15, 16.) This statute is general, and, of course, applies as well to foreign as to domestic executors.

From the rule that the executor derives his authority over the assets from the sovereign power of the State where the

assets are situated, flows, as a necessary consequence, the proposition that he is responsible for his acts to the body politic from which he obtained his appointment. He cannot be permitted to accept the commission, and deny his accountability. If the grant, by means of which he became vested with rights over property situated here, were made here, he must account for the exercise of this trust, to our tribunals. He has invoked this jurisdiction to obtain his authority, and will not be permitted to repudiate it, when required to render an account of his stewardship. These principles are universally received, and I am not aware there exists any well regulated community where it is not admitted that the grant of administration and the adjustment of the accounts of the executor or administrator belong, of right, to the State where the assets are situated.

Our statutes contain full and ample provisions regulating proceedings for the settlement of the accounts of executors and administrators, and obligating the Surrogate to a specified course of procedure in all cases, without exhibiting any line of distinction, where the decedent was domiciled in this or in a foreign State. For example, where there is a legacy due to a minor, who has no general guardian, it becomes the duty of the Surrogate to take the legacy and invest it for the benefit of the minor; and in this respect there is no distinction made between minors residing here or abroad. (2 *R. S., p.* 91, § 53, [48,] *p.* 98, § 87, [80.] It is also provided that, "whenever an account shall be rendered and finally settled, if it shall appear to the Surrogate that any part of the estate remains to be paid or distributed, he shall make a decree for the payment and distribution of what shall so remain, to and among the creditors, legatees, widow and next of kin to the deceased, according to their respective rights; and in such decree shall settle and determine all questions concerning any debt, claim, legacy, bequest, or distributive share, to whom the same shall be payable, and the sum to be paid to each person." (2 *R. S., p.* 95, § 71.) These statutory directions are positive; they recognize no difference between

cases of domestic or foreign domicil; and *imperatively* require me, upon a final accounting, to make a decree which shall dispose of every question arising upon a will and its construction, when presented by parties interested, in as full and complete a manner as a Court of Equity possessing jurisdiction over testamentary trusts. (*Kidd* vs. *Chapman*, 2 *Barb. C. R.*, 423.) In order then to close the accounts of the executor, and settle them, up to this period, and decree what disposition he must make of this estate, which he has become possessed of under the authority of the laws of the State of New-York, it is my duty to look into this will, interpret its language, if there be room for difficulty, and direct a distribution according to the tenor and effect of its provisions. This must be done, and the decree, if not appealed from, will be obligatory and conclusive upon the executor, and upon all persons brought before the court and made parties, in conformity with the procedure established by the statute. Such is our law, and such is the law of Connecticut. In the case already cited, the Supreme Court of that State declared, that an administrator, appointed in New-York, and who had accounted here, " could not be liable, if he fairly discharged his trust agreeable to the law of the State or country from which he received it ; and this principle," the court added, " so reasonable in itself, and so conformable to the principles of justice, and so necessary for the security of individuals, we recognize as our law, and feel bound therefore to say that this defendant ought to be protected, when he has but pursued the orders and decrees of the court, from which his authority emanated." Whether in making its decree on a final accounting, the court, after ascertaining the rights of creditors and legatees who have appeared, should direct the residue of the estate to be transmitted to the domicil of the decedent, is a question which I will shortly consider, but at this point it is necessary only to say that the decree, whatever it may be, is obligatory upon the parties, and affords an indemnity to the executor or administrator.

That this estate is to be distributed, and this will in-

terpreted according to the law of the domicil of the testator, is a proposition I admit in its broadest extent. Such is the law in all civilized nations; the law of the domicil in relation to movables having been adopted as the criterion, except in a few special instances. I feel impelled, however, to observe, that the interpretation of this will does not seem to depend upon any particular rules existing in Connecticut, or upon the meaning of phrases or terms of art. The construction apparently involves only a determination of the testator's intention, as deducible from ordinary language and phrase-ology. Under this state of facts why should there be any postponement?

The executor has invoked my jurisdiction to settle his accounts, three of the legatees have intervened, and claimed a decision as to their rights, and there does not appear to be any special reason why there should be delay in the adjudication. All the legatees are now living in the State of New-York, their mother, the executrix, accedes to the action of this court, and no one opposes it save the executor, who derived his authority from the Surrogate of New-York, and after instituting these proceedings, has himself and alone commenced an action in the State of Connecticut. I see no reason under such circumstances for delaying my consideration of the substantial questions at issue between the parties. They have been argued, and it is my duty to pass upon them. The appearance and residence in this State of the legatees, makes it incumbent upon me to administer their rights in this *forum*, and not to send them abroad. In the language of Story, " the new administration is made subservient to the rights of creditors, legatees, and distributees, who are resident within the country where it is granted, and the residuum is transmissible to the foreign country, only when a final account has been settled in the proper tribunal where the new administration is granted upon the equitable principles adopted by its own law, in the application and distribution of the assets found there." (*Conflict of Laws*, § 513, *Dawes* vs. *Head*, 3 *Pick.*, 128.) In the case of *Harvey* vs. *Richards*, (1

*Mason*, 381,) the same eminent jurist said, "I have no objection to the use of the terms principal and auxiliary, as indicating a distinction in fact as to the objects of the different administrations; but we should guard ourselves against the conclusion, that therefore there is a distinction in law as to the rights of parties. There is no magic in words. Each of these administrations may be properly considered as a principal one, with reference to the limits of its exclusive authority; and each might, under circumstances, justly be deemed an auxiliary administration. If the bulk of the property, and all the heirs, and legatees, and creditors were here, and the foreign administration were only to recover a few inconsiderable claims, that would most correctly be denominated a mere auxiliary administration for the beneficial use of the parties here, although the domicil of the testator were abroad. The converse case would, of course, produce an opposite result. But I am yet to learn what possible difference it can make in the rights of parties before the court, whether the administration be a principal, or an auxiliary administration. They must stand upon the authority of the law to administer or deny relief, under all the circumstances of their case, and not upon a mere technical distinction of very recent origin." The simple question for my consideration is, whether I shall send parties who are now citizens of this State, to another tribunal to seek those rights to which they are entitled from this court. That is the point; for I must lay the suit brought in Connecticut, after this present proceeding was instituted, out of view, as an after thought and an attempt to withdraw the case from this jurisdiction. Had the suit there preceded the suit here, there might have been some ground upon which to urge an appeal to comity—but the converse being the case, the appeal to comity seems to me to be in the other direction.

Looking then at the substantial matters involved, and proceeding to decide upon the construction of this will, I feel bound to apply such rules of interpretation as prevail in Connecticut, wherever they have been indicated by the decisions

of the courts. I do not find, however, any peculiar doctrine, exceptional to the general law relative to testamentary cases. In the first place, it is clearly established, that in the interpretation of the will, the intent of the testator, as gathered from the instrument in its application to surrounding circumstances, must govern (*Holms* vs. *Williams*, 1 *Root R.*, 332); and that parol evidence of the intention of the testator is inadmissible to vary the express terms of the will. (*Avery* vs. *Chappel*, 6 *Conn. R.*, 270; *Matthews* vs. *Saunders*, 11 *Conn. R.*, 144; *Canfield* vs. *Bostwick*, 21 *Conn. R.*, 550.) Now let us see what the intent of this instrument is, as evinced in its progressive stages. After directing the payment of his debts, Mr. Parsons makes a devise and bequest to his wife, and requires his executors to pay to her annually from his estate, the sum of seven hundred dollars in quarterly payments, until her marriage or decease. There is nothing peculiar in this provision for an annuity. It is payable "out of the estate," but those words are mere surplusage—it would have been so payable without them. It implies, of course, that a fund shall be reserved for that purpose, but the reservation of a fund for that purpose, does not imply a reservation for another purpose. It never has been pretended that a general provision for an annuity affects the question as to the vesting of the estate upon which it is a charge. In the next place, we come to the prominent and leading disposition of the will. The testator gives all the residue and remainder of his estate, real and personal, by the broadest words of description, to his executors in trust. That a trust does not prevent the vesting of the estate *de jure*, in the *cestui que trust*, is an undeniable proposition. The legal title may be in the trustees, but they are mere repositories, and the equitable right is always held by courts of equity as vested on the testator's death in the beneficiaries. The rules in regard to the vesting of testamentary bequests are not varied by reason of the intervention of a trust, unless it be that there is a stronger implication in favor of vesting where there is a trust than where there is not. (*Van Wyck* vs. *Bloodgood*, 1 *Brad. Sur. R.*, 154, *and cases cited.*)

The main difference between a devise in trust and a direct devise, is, that in the former case there is a vested equitable estate (*Doe* vs. *Ewart*, 7 *Adol. & E.*, 636; *Phipps* vs. *Williams*, 5 *Simon R.*, 44); and in the latter a vested legal estate; and, in regard to personal property, direct legacies as well as bequests in trust, are effectuated only through the medium of the executors. (*Davies* vs. *Fisher*, 5 *Bear.*, 201.)

By the fifth clause of the will, the testator gave the residue of his estate to the executors in trust, as follows: "Two fifth parts thereof for the sole use and benefit of my son Joseph H. Parsons, and his heirs and assigns forever; and the remaining three fifth parts thereof for the sole use and benefit of my daughters Catharine M. Parsons, Elizabeth A. Parsons, and Caroline J. Parsons, in equal shares, to them respectively, and their respective heirs and assigns forever." There can be no doubt that as these shares are given in severalty, the donees take under the will as tenants in common. (*Griswold* vs. *Johnson*, 5 *Conn. R.*, 363.) Nor is there room for hesitation in saying that the gift is absolute, and for the benefit of each of the children. It has all those qualities which in regard to lands would create an estate in fee. It is for the use of the children "respectively, and their respective heirs and assigns forever." Had the will ceased here, no one could have imagined a difficulty in its interpretation. Up to this point it is clear, and vests in the donees an equitable right and estate, transmissible to their legal representatives. This is all I find in the instrument relating to the *gift;* the subsequent provisions appear to point only to payment, or to limitations over, on the demise of any party interested before payment. Thus the very next direction is, that during the minority of the children, the executors shall provide for their support and education; but here again the *gift* is recognized, by charging the sums disbursed for each on "his or her *share.*" This brings us to another familiar principle, that where there is uncertainty as to the vesting of the legacy, a provision for maintenance helps the vesting; but there is no instance to be found where such a provision has been taken

to operate against the vesting. (*Fonereau* vs. *Fonereau*, 3 *Atk.*, 645; *Hoath* vs. *Hoath*, 2 *Bro. C. C.*, 4; *Walcott* vs. *Hall*, 2 *Bro. C. C.*, 305.)

The testator having divided his estate into four shares, giving to each child a share absolutely, and then directed maintenance during minority, we come to the provisions relating to payment. He says, " the said trustees shall pay to my said son, on his attaining the age of twenty-one years, the sum of five thousand dollars, and if they judge best, a further sum not exceeding five thousand dollars more, if they think it will be for his interest; on his attaining to the age of twenty-three years, the said trustees shall pay to him such an amount as they shall deem it most for his interest to receive, not exceeding ten thousand dollars; on his attaining to the age of twenty-five years, the said trustees shall pay to him such sum as in their sound discretion they shall consider it most for his interest to receive, but not exceeding in any one year, the sum of ten thousand dollars; and they shall so continue to make such payments from one period of two years to another, until the share of my said son shall be fully paid off and discharged." It is manifest that the *corpus* of the estate is the subject of this clause, and that it has in con templation that the " share" of the son in the estate should be " fully paid and discharged." Had the will stopped at this point, then in case of the decease of the son, his legal representatives would have been entitled to that share. So with regard to the daughters, " the said trustees shall pay to each of my said daughters, on their respectively attaining to the age of twenty-one years, the sum of two thousand dollars, and every two years thereafter the sum of two thousand dollars, until the share of each shall have been fully paid off and discharged; but if after making said first payment to each of my said daughters, my said trustees shall deem it expedient to make the subsequent payments less than two thousand dollars each, they are authorized in the exercise of a fair and sound discretion to diminish such subsequent payments accordingly, provided they use no unnecessary delay

in making ultimate payment of the share of each as aforesaid."
Had the will stopped at this point, then in case of the decease
of any one of the daughters, her legal representatives would
have been entitled to her share, the *corpus* of the estate being
the subject of the clause, and the " ultimate payment of the
share of each" being contemplated.   The case then would
have been precisely equivalent to a gift *in presenti* to A,
payable at twenty-one, or in instalments, annually or bien-
nially, which being vested, would pass to the representatives
of the legatee, if he died before the time of payment arrived.
Thus far we have a division of the estate, in the first instance
into *shares*, a gift in *shares*, a charge of maintenance upon
each *share* respectively, and a subsequent direction as to
payment until the " *share*" of each be " fully paid off and
discharged."    These are vested estates, and they can be
divested only upon the happening of the precise contingency,
and to the precise extent prescribed by the testator.    " The
primary gift includes the testator's whole estate or interest,
and that interest remains in the objects in every event,
upon which it is not divested." (*Powell on Devises*, 2,
*p*. 264, *Jarman's Ed.*)   " A clear absolute gift will not
be divested upon reasoning merely conjectural." (*Ibid.*,
625 ; *Browne* vs. *Lord Kenyon*, 3 *Mad.*, 410; *Belk* vs.
*Slack*, 1 *Keen*, 238, 1 *Jarman on Wills*, 750.)   Now let
us look at the clause divesting these estates.   It reads as
follows : " If my said son shall die before receiving payment
of his share as aforesaid, leaving no lawful issue, then
his said share remaining in the hands of said trustees
shall be paid and delivered over in equal shares to my
daughters and their heirs and assigns for ever ; and if any
one or more of my said daughters shall die, before receiving
payment of their respective shares as aforesaid, then in case
such decedent or decedents shall leave no lawful issue, their
respective shares aforesaid remaining in the hands of said
trustees, shall be paid and delivered over in such manner and
proportion, that my said son shall have two fifths of each
share, and the surviving daughters the residue thereof in

equal shares to them respectively, and their respective heirs and assigns for ever. If any one or more of my said children shall die, leaving lawful issue, then such issue shall be entitled in equal portions to the share or shares of the respective parent or parents, remaining in the hands of said trustees; but in such case the said trustees are empowered and directed to hold and dispose of such share or shares in such manner that said issue only and their legal representatives, and no other person or persons, shall have the benefit or advantage thereof." This clause divests the previous gifts, upon the event of death before receiving payment; but what is it that is given over? Why, in respect to the son, it is " his *said* share," and, in respect to the daughters, " their respective shares *aforesaid;*" that is, the shares previously mentioned; and so we are drawn back to the primary gift, where their shares are described as portions of the testator's estate at the time of his death. I perceive nothing in the remainder of the will affecting the question now before the court. There are directions to sell certain properties, and to add the proceeds of the sale to " the general fund;" a provision for an intermediate rental, without any direction to add the rent to the general fund; and a requisition for the collection of negotiable paper on hand at the time of his decease, and the investment of the proceeds, " as well as all other funds which may come into the hands of the trustees," " until such funds are wanted to fulfil the provisions of the will." This last clause is nothing more than the law would require, and simply calls for an investment for the purposes of the will, without affording any indication what those purposes are. It would call for an investment of income when the will called for it, expressly or by implication, say during the minority of the legatees; and would not demand an investment of income when the will did not demand it, say after majority. It is in fact a general expression, which has scope for operation during the minority of the legatees, and can be literally satisfied by a construction which requires investment only during minority. I should say, therefore, upon the

whole will, that the testator had given vested interests to his children, as tenants in common, subject to be divested upon death before payment; that the payments intended refer to the capital of the estate and not to its income; that it is only the capital which can be retained until the times prescribed for payment, and that the income of the shares belongs to the respective owners of the respective shares of the capital, and is payable as it accrues. It is remarkable that the word "income" is not once used throughout the entire instrument, nor its equivalent—not even when the testator directs his estate to be invested, nor when he provides for the rental of the houses in New-York. I do not presume an intestacy as to the income, from this silence. (*White* vs. *Fisk*, 22 *Conn. R.*, 31.) That would partially destroy the preference shown to the son. But a failure to speak specially on this point leaves the law to its operation, and the shares being vested, the income is due as a matter of right to the owners of the shares. Again, it is observable throughout the instrument, that the portions treated of are constantly termed the "shares" of the children, that they are uniformly considered as vested in and belonging to them, as to be paid to them, and as only given over in case of death before payment; and when we go back, step by step, to find out what those shares are, they are discovered to be the original shares as contained in the primary gift of the corpus of the testator's estate. It certainly would be strange, if the testator had contemplated locking up these shares by accumulating and compounding the income, that in so accurate and symmetrical a will, he should never have intimated a thought or a wish on the subject. To effect such an unusual purpose, would naturally lead the mind to devise careful ways and expedients, and precise provisions. The idea has certainly not been formally expressed, nor is it to be necessarily implied from any provisions of the will. Implication, in order to affect or vary clear vested rights, must be necessary, and not merely probable or conjectural. (1 *Jarman*, 465.) Nor must it be overlooked that, in the absence of any clear special provision

to the contrary, the terms of the original gift are such as to involve and include the disposition of the income. The gift of the shares is "for the sole use and benefit" of the children respectively.

Residuary dispositions are particularly favored, not only in regard to vesting, but also in respect to the title of the legatee to the profits or fruit of the fund, accruing before the time of payment. Thus, where there is a bequest of the residue, not payable until majority, with a gift over in case the legatee die under that age; if the gift over take effect after the happening of the contingency, still the representative of the legatee will be entitled to the intermediate interest. (*Nicholls* vs. *Osborn*, 2 *P. W'ms.*, 419; *Hawkins* vs. *Combe*, 1 *Bro. C. C.*, 335; *Skey* vs. *Barnes*, 3 *Meriv.* 335.) The interest is the " natural produce," and, in the language of Baron Eyre, " must go to the person who has the thing liable to be divested." (*Chaworth* vs. *Hooper*, 1 *Bro. C. C.*, 81.) The whole estate is given absolutely on the testator's death, for the *sole use and benefit* of his children; the income is theirs of right, as flowing from this absolute gift; the bequest over, when it shall take effect, if ever, can only carry the original shares, but not income springing out of the previously vested estate. I do not see that this interpretation is at all affected by the consideration whether or not the testator has directed a severance and separate investment of the shares of the children, or has allowed them to remain together in one fund. The bequest in trust is for them as tenants in common, and that effects a legal severance, which is all that is required. The provisions of the will effect a severance of the fund in fact, as often as they call for payments to the parties. It never was heard of that the vesting of an estate was prevented by giving aliquot shares out of a general fund, instead of making a partition in fact, or that the right to the increase depended in the slightest degree upon such a distinction.

Taking, then, the first and original disposition in the fifth clause, and bearing in mind that "it is a settled and invari-

able rule not to disturb the prior devise further than is abso-
lutely necessary for the purpose of giving effect to the pos-
terior qualifying disposition," (1 *Jarman on Wills*, *p.* 414,)
can the court discover in the subsequent directions as to pay-
ment, any repugnancy with the original bequest, or with the
" use" of the shares given by it? Mere payment, and the ·
time and mode and extent, are not so repugnant, unless the
payment expressly or impliedly refers to the " use" or the
profits, as well as to the principal. ' The language of the will
limits the direction as to payment, and also the gift over to
issue, to the " shares." These shares were ascertained on the
testator's decease, and were then severed in right. It is a gene-
ral canon of interpretation, that the term " share" is limited to
the original portion, unless particular expressions extend this
meaning. (*Rickett* vs. *Guillemard*, 5 *Jurist*, 818, *and* 12 *Sim.*
88.) There are no such particular expressions here, and the
limited meaning cannot therefore be extended. As a matter
of legal interpretation therefore, I must hold that the will, in
the first instance, gives by its express terms the right to the
capital and the right to its use and beneficial enjoyment, to
the testator's children, and the subsequent directions in rela-
tion to payment of the respective portions in the residue
refer to the capital of the estate only.

It is insisted however, by the counsel for the legatees, that
the provisions regulating the payments to the children are
inconsistent with the general intent of the will, and should
therefore be rejected by the court for incongruity. They
claim that as each of the daughters' shares, at the time of the
testator's death, was about $26,000, the interest upon which
amounts biennially to over $3,600, a biennial payment of
$2,000 would not only never be able to accomplish the tes-
tator's express wish that there should be " ultimate payment"
of the shares to the daughters, but would in fact never allow
a dollar of the principal to reach them, and would result in
an accumulation of a large portion of the income itself. The
will was made shortly before the testator died, and the pre-
sumption is that he knew the value of his estate. It is

unreasonable to suppose that, in the same breath, he should direct full payment and discharge of the shares, and still provide such small payments as never could accomplish that end. I see the force of this argument, but it bears only against a construction which locks up and accumulates the income, and not against the view that the limited payments apply only to the primary shares. Taking these payments as they appear *primâ facie*, as applicable only to the principal and not to the income, the shares would be discharged in twenty-six years after the testator's decease, supposing the parties were of full age. That period cannot be considered as an improbable or unreasonable limitation by a parent over the shares of his daughters, whose immediate possession of their entire property he has thought it wise and proper to curtail. Such an interpretation of the will as comports with well-established legal principles, with the language of the instrument in its ordinary intent and purport, and with the expressed design of giving the legatees the use of the estate, and ultimate enjoyment of the principal, by no means conflicts with the actual value and condition of the estate, or with such dispositions as a father might naturally be supposed to desire to make. I confess that I can see no possible ground for holding any portion of this will void. It seems to me to be plain, clear and explicit, lucid and harmonious, conformable to law, and constructed on a plan or scheme entirely congruous. My decision is, that the children are entitled to all the produce of their shares, from the time of the testator's decease, deducting what has been expended for their maintenance, respectively, and that the biennial payments are applicable alone to the principal.

There remains still, a question as to the liability of the executor to account for the assets he collected in this State before becoming qualified. The law on that point is definitely settled. I have already shown that the *situs rei* regulates the grant of administration, and establishes the *forum* as to the accounting. The residence of the debtor constitutes the *situs*. Even negotiable notes are assets at the place of residence of the

maker at the time of the creditor's death. (*Slocum* vs. *Sanford*, 2 *Conn. R.*, 533.) If the property, collected by the executor from debtors residing in this State, before he took out letters, were assets, of which there can be no doubt, then the executor is bound to account for those assets here. For such purposes the letters relate back to the time of the decease. That is the common law, and in respect to legatees and distributees, the statute has not altered the rule. Where the executor or administrator has received or collected moneys belonging to the estate voluntarily paid to him, or where he has wrongfully taken possession of and converted to his own use property belonging to the estate of the testator or intestate before administration granted, " as to all such acts he stands the same after receiving letters, as if he had been executor or administrator at the time." (*Bellinger* vs. *Ford*, 21, *Barb. S. C. R.*, 311.) The executor must therefore be held to account for the assets realized by him in this jurisdiction, before as well as after letters testamentary were issued. After the details of the account are settled, there must be a decree in conformity with the principles I have indicated.